UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

PETROLEUM ENHANCER, LLC,
A Michigan Limited Liability Company,

               Plaintiff/Counter-Defendant,            Case No. 07-12425
                                                        Honorable Thomas L. Ludington

v.

LESTER R. WOODWARD,

               Defendant,

and

POLAR MOLECULAR CORP.,

               Intervenor-Plaintiff,

POLAR MOLECULAR HOLDING CORP.,

               Interpleader-Plaintiff/Third-Party/
               Counter-Plaintiff

v.

AFFILIATED INVESTMENTS, LLC, BARBARA
SOCIA as Personal Representative of the Estate of
Richard J. Socia, Deceased, CARL HILL, BRUCE
BECKER, A. RICHARD NELSON,

               Third-Party Defendants.

_____

In re: POLAR MOLECULAR CORP.

POLAR MOLECULAR CORP.,                        Case No. 09-10247
                                                      Honorable Thomas L. Ludington

               Plaintiff,

v.

PETROLEUM ENHANCER, LLC.,

               Defendant.

_____/

**OPINION AND ORDER GRANTING INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Polar Molecular Corporation (PMC) is a wholly owned subsidiary of Interpleader-Plaintiff Polar Molecular Holding Corporation (Polar Holding).  At all times relevant to this case, PMC was engaged in the petroleum-additive business.  In 2006, PMC was in default on a loan for which it had pledged allegedly valuable intellectual property as collateral.  Polar Holding was also undergoing an internal dispute between two shareholders and board members regarding the business strategy of PMC.  This dispute eventually caused one of those directors, Richard Socia, to organize an enterprise called Petroleum Enhancer, LLC to purchase the lender's interest in PMC's promissory note and collateral.  Petroleum Enhancer was incorporated in March 2007, Socia resigned from Polar Holding's board less than one month later, and Petroleum Enhancer acquired PMC's loan shortly thereafter.

In 2007, Petroleum Enhancer brought suit in this Court against Lester Woodward, an escrow agent in possession of PMC's collateral, alleging that PMC was in default on the payment of its promissory note.  Polar Holding and PMC intervened in the lawsuit and filed counterclaims against Petroleum Enhancer and a third-party complaint against a number of additional parties, including Socia.  After a round of dispositive motions and an appeal to the Sixth Circuit, Polar Holding is back before this Court asserting claims for breach of fiduciary duty, civil conspiracy, and tortious interference against three Individual Defendants: Socia, Bruce Becker, and Carl Hill (the Individual Defendants).  On November 2, 2012, the Individual Defendants moved for summary judgment.  The motion for summary judgment will be granted.

# I

While reviewing the case on appeal, the Sixth Circuit provided an extensive explanation of the background to the case.  It is reproduced below:

## A.  Factual background

The disagreement concerning the business strategy of PMC was between Mark Nelson, Polar Holding's President, Chief Executive Officer (CEO), and Chairman of the Board, on the one hand, and Socia, on the other.  This disagreement eventually created animosity between the two, which came to a head during a January 26, 2007 board meeting of Polar Holding.  Both Nelson and Socia were present at the meeting, as were Polar Holding's three other directors, two of whom were Walter Fay and Robert MacKenzie.

The meeting, which had been called by Socia, opened with Socia attempting to remove Nelson from his positions as President, CEO, and Chairman.  But Socia's motion for removal did not pass, and Nelson then responded in kind.  He moved for Socia's removal as Polar Holding's secretary and demanded his resignation from the board of directors.  These motions passed by a vote of three to two, with the board resolving to "remove Richard Socia as the company's Secretary" and to "demand Richard Socia's resignation" from his position on the board.  Fay was contemporaneously appointed as Polar Holding's new secretary.

Three days later, on January 29, 2007, Polar Holding's board of directors held another meeting.  Socia and MacKenzie — the two directors who had voted against Nelson's motions at the previous meeting — did not attend.  Their names appear in the minutes as absent directors.  At this meeting, the board voted to appoint Sharon Minnock "to fill a vacancy on the Board of Directors."  The board next passed a motion demanding MacKenzie's resignation from the board and calling "for the removal of both Richard Socia and Robert MacKenzie from any and all roles with Polar Molecular Holding Corporation, including roles as officer and Board committee members."

Needless to say, Socia did not take kindly to what had transpired at these meetings.  On January 31, 2007, he wrote Nelson a letter that begins as follows:

> I think it is time to set the record straight. I am a Director, of Polar Molecular Holding Company, who serves at the pleasure of the shareholders, not you. I want you to produce the written authority—not your interpretation—that gives you and/or your puppets the authority to remove me. I want you to know I have no intention of resigning from this Board.

The letter concludes in similar fashion: "I am going to continue to protect the shareholders."

Socia reaffirmed these sentiments in a March 5, 2007 letter to Minnock, in which he referred to himself as a director, questioned the legality of Minnock's appointment to the board, and stated flatly that he "refused to resign" from his position. He also provided an explanation for this refusal: "I refused to resign my post as Director for one reason, Mark [Nelson] duped me and I know I am a representative of shareholders[;] not just specific shareholder interests, but all shareholders. I will continue to work to save the products and opportunities that exist at Polar."

After the board refused to oust Nelson and purported to replace Socia instead, Socia came up with an idea. He knew that PMC had entered into a financing agreement with Affiliated Investments, LLC (Affiliated) in October 2001. Under the terms of that agreement, PMC had received a $600,000 loan from Affiliated, which PMC promised to repay in full by January 2005. But PMC had defaulted on its repayment obligations and remained in default in early 2007. Despite PMC's default, Affiliated had not yet sought repayment of the loan. Nor had it taken legal action to recover the patents and other intellectual property that PMC had pledged as collateral. Affiliated's president, Bruce Becker, stated that he had not done so because he "had no knowledge of [the petroleum-additive] industry or what to do with the patents."

But Socia suffered from no such lack of expertise, and he suggested to Becker a way in which the two could exercise Affiliated's right to foreclose on the defaulted loan. Socia, Becker, and Carl Hill, the latter being a Polar Holding consultant, would form a new company for the purpose of purchasing the promissory note from Affiliated and then immediately bring a foreclosure action against Polar Holding to secure the collateral. According to Socia's deposition testimony, he intended for the foreclosure to put pressure on Nelson to make certain business decisions with respect to PMC that Socia thought would make PMC more profitable. A March 16, 2007 email sent by Hill to Socia and Karen Dobleske (Becker's business manager at Affiliated) provides a glimpse into how the plan unfolded:

> Dick [Socia] came up with a thought that I think might make a lot of sense. Since [PMC] owes Affiliated the patents that are new and not included in the escrow arrangement[,] . . . maybe Affiliated ought to ask for those patents to be put into the escrow account now . . . before we make our move through foreclosure. Nelson would have a hard time arguing about the request [,] . . . especially since Affiliated just sent him dough to help with patent registration.

(Ellipses in original.)

- 4 -

Socia, Becker, and Hill incorporated Petroleum on March 22, 2007, with its principal place of business in Essexville, Michigan. On April 18, 2007, Socia submitted his resignation as a director of Polar Holding, effective immediately. He cited as the "last straw" a conversation that he had had with Fay three days earlier regarding product-liability insurance. Eight days after Socia's resignation, Affiliated assigned all of its rights, title, and interest in PMC's promissory note and collateral to Petroleum in exchange for $2 million.

Prior to these events, PMC had been seeking to shore up its financial standing. Its principal means of doing so was through a financing agreement with a company called IBK Capital Corporation (IBK). IBK's president, William White, signed an engagement letter in December 2006 stating that IBK would "endeavor to obtain for [PMC] . . . a private placement of up to $10.0 million of convertible preferred shares or some other acceptable financing arrangement." The letter provided that the agreement would "continue for six months," but also stated that the agreement could "be terminated or extended" by either IBK or PMC at any time "upon notice in writing." Nelson returned the letter to IBK with his signature after discussing the matter at an executive-committee meeting later that same month. Socia was not a member of the executive committee and thus did not attend the meeting.

On January 2, 2007, IBK received Polar Holding's Form 10–K (an annual filing required by the Securities Exchange Act of 1934) for the fiscal year ending on December 31, 2004. Prior to receiving this form, IBK had not conducted any research into the financial background of Polar Holding or PMC, nor had it reviewed any financial-reporting information submitted by either company.

The initial review of Polar Holding's Form 10–K by IBK's staff noted several "red flags," including that the form was two years old, disclosed extensive litigation involving Polar Holding or PMC, and revealed that there had been a change in the accounting firm that audited Polar Holding's finances. White then reviewed the information himself and was not comforted. Based on these concerns, IBK decided to terminate its efforts to seek a financing arrangement for PMC. White notified Nelson of IBK's decision in a letter dated January 22, 2007. In his deposition testimony, Nelson stated that White later implied — during a conversation that "[c]ould have been" in 2008 — that Socia had contacted White prior to IBK's termination of the engagement letter. Later, in a handwritten amendment to his deposition, Nelson clarified when this conversation allegedly took place: "Based on a telephone discussion I had with IBK [a]t about 1:45 PM on June 5th, 2008 I believed Dick Socia had spoken with IBK."

White, however, denied that any conversation between the two took place in 2008. And Socia stated that he has never communicated with anyone at IBK, including White. White further testified that his standard business practice is to make a record of such conversations, and that no record of this kind exists regarding Socia. He also said that IBK's decision to terminate its efforts to seek

financing for PMC was based solely on the "red flags" raised in IBK's independent review of Polar Holding's Form 10–K, not on any conversation with Socia or anyone else affiliated with Polar Holding or PMC.

Without financing, PMC was unable to repay its loan to Affiliated. Petroleum advised Woodward (the escrow agent in possession of the collateral) in May 2007 that it was now the holder of PMC's promissory note and collateral, and that PMC was in default on its obligations under the loan agreement. Woodward, however, refused to deliver the collateral to Petroleum for reasons not stated in the record.

**B. Procedural background**

In June 2007, Petroleum filed a complaint against Woodward in the United States District Court for the Eastern District of Michigan. The complaint requested that Woodward be ordered to release possession of the collateral that he was holding in escrow and to deliver it to Petroleum. On September 14, 2007, the district court did just that. Approximately two weeks later, Petroleum proposed procedures for the sale of the collateral in accordance with Article 9 of the Uniform Commercial Code. The sale was eventually scheduled for January 14, 2008. Any proceeds greater than the amount of the unpaid debt would be returned to PMC.

Polar Holding and PMC then moved to intervene in the lawsuit. The district court granted their unopposed motion on November 7, 2007. Shortly thereafter, Polar Holding and PMC filed counterclaims against Petroleum and a third-party complaint against (among others) Affiliated, Becker, Hill, and Socia. Polar Holding and PMC alleged claims under Michigan law for breach of fiduciary duty, civil conspiracy, and tortious interference. The gist of their allegations is that Petroleum was formed by fiduciaries of Polar Holding for the sole purpose of acquiring PMC's promissory note and collateral, and that the named individuals meddled in Polar Holding's relationship with IBK and caused IBK to terminate its efforts to seek financing for PMC.

In January 2008, PMC filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Colorado. The petition automatically stayed the sale of the collateral, but the petition was later dismissed when PMC's counsel withdrew because of an ethical conflict. PMC then filed a second Chapter 11 bankruptcy petition in the same court in August 2008, which again caused the sale of the collateral to be stayed. Two months later, PMC commenced an adversary proceeding in the bankruptcy court against Petroleum. The adversary proceeding was transferred to the United States District Court for the Eastern District of Michigan in January 2009, where the proceeding was consolidated with the present case.

PMC's Chapter 11 bankruptcy case was converted to a Chapter 7 liquidation shortly thereafter, and the bankruptcy court appointed a trustee to act as the

representative of PMC's estate.  As a consequence of these developments, all of PMC's assets — including its legal claims against Petroleum and the third-party defendants — are controlled by the trustee.  The bankruptcy court lifted the automatic stay in July 2009 and authorized Petroleum to proceed with the foreclosure sale.  When the sale took place in September 2009, Petroleum was the only bidder, with a bid of $1.85 million.

Because PMC no longer had the independent ability to pursue its claims in the district court, and because PMC's counterclaims and third-party complaint had been filed jointly with Polar Holding, the district court directed Polar Holding in January 2010 "to file a supplemental complaint as to its counterclaims and third-party complaint."  *Petroleum Enhancer, LLC v. Woodward*, No. 07–12425–BC, 2010 WL 100892, at *6 (E.D.Mich. Jan. 5, 2010) (unpublished opinion).  The court also determined that Polar Holding's claims, to be set forth in its supplemental complaint, "must be based on a breach of a primary duty to [Polar Holding], with a resultant injury to [Polar Holding] that is not derived from a breach of duty with a resultant injury to [PMC] that could be recovered by the trustee if he or she decides to pursue the cause of action." *Id.*

Not long after the district court's order, Polar Holding filed its supplemental complaint, and discovery was taken.  In August 2010, the Petroleum parties filed a motion for summary judgment with respect to all of Polar Holding's claims. The district court granted the motion in its entirety in January 2011.  Polar Holding [] timely appealed, but its appeal [was] limited to the dismissal of its claims against Socia and the other individual third-party defendants; the dismissal of its claims against Petroleum and Affiliated [was] not [] challenged.

*Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 761–65 (6th Cir. 2012).  After review, the Sixth Circuit remanded the case to this Court to assess Polar Holding's three remaining claims: that Socia breached his fiduciary duty to Polar Holding; that he tortiously interfered with an advantageous business relationship between Polar Holding and PMC, and that the Individual Defendants (Socia, Becker, and Hill) conspired together to breach Socia's fiduciary duty.

A few points related to the background information provided above require specific emphasis.  As the Sixth Circuit noted, after the bankruptcy court lifted the automatic stay in July 2009, a foreclosure sale on PMC's collateral commenced.  When the sale took place in September 2009, Petroleum was the only bidder, with a (credit) bid of $1.85 million.  The Sixth

Circuit did not highlight the great lengths that were taken to ensure that the collateral was sold for its highest value.

On September 13, 2007, this Court ordered Petroleum Enhancer to submit "a proposed order regarding the terms of the sale of the intellectual property, in accordance with the loan documents and the relevant law." Sep. 13, 2007 Order 2, ECF No. 26. Petroleum Enhancer was ordered to "serve a copy of that proposed order" on Polar Holding as well. *Id*. Polar Holding was then given the opportunity to file objections to Petroleum Enhancer's proposed method of sale. *Id*.

On September 27, 2007, Petroleum Enhancer filed its proposed method of sale. Included was a section concerning "Notification and Advertisement." This section established:

> On the Notification Date [20 days before the Sale Date], Petroleum will send notification of the disposition . . . to (a) Polar; (b) any secondary obligor; (c) any other person from which Petroleum has received before the Notification Date an authenticated notification of a claim of an interest in the collateral; (d) any other secured party or lienholder identified in the Delaware Secretary of State's search report as having filed a financing statement covering the collateral; and (e) any other secured party that, 10 days before the Notification Date, held a security interest in the collateral perfected by compliance with a statute, regulation or treaty . . . . Also on or about the Notification Date, the disposition will be advertised in the Detroit Legal News, Detroit Free Press and the Wall Street Journal.

Sept. 27, 2007 Notice of Filing 2, ECF No. 30. The information to be distributed to potential buyers included the date and time of the sale, the method of required payment, and a list of the intellectual property that was being sold. *Id*. at Exs. A–B. This same information was provided in Petroleum Enhancer's Third Motion to Proceed with Foreclosure Action, ECF No. 84, filed August 6, 2009. Noted above, the sale then took place on September 15, 2009 according to those

procedures.[1]   Despite the procedures being in place, Petroleum Enhancer remained the only bidder for the collateral at the auction.

Since publication of the Sixth Circuit's opinion, the Court has also learned that Socia passed away.  Upon Polar Holding's motion, Barbara Socia, as Personal Representative of the "Estate of Richard J. Socia, Deceased," was substituted as a third-party defendant in his place. On November 2, 2012, the Individual Defendants filed a motion for summary judgment, asserting that they are entitled to judgment as a matter of law on all three of Polar Holding's claims.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 251–52 (1986).  All justifiable inferences from the evidence are drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  Summary judgment is proper where a plaintiff fails to produce evidence creating a genuine issue of material fact as to any of the essential elements of its prima facie case. *Dietelbach v. Ohio Edison Co.*, 1 F. App'x 435, 437 (6th Cir. 2001) (citing *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995)).

Because jurisdiction here is based on diversity of citizenship, the Court must "apply state law in accordance with the controlling decisions of the state supreme court." *JP Morgan Chase*

---

[1] As established in Petroleum Enhancer's Response to Polar Holding's Motion for Temporary Restraining Order, ECF No. 91, "Petroleum intends to proceed with the foreclosure sale it scheduled for September 15, 2009 . . . intending to follow procedures previously approved by this Court pursuant to a prior motion in connection with a scheduled sale that was stayed by the Debtor's most recent bankruptcy filing." *Id*. at 5.

*Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007). Accordingly, Michigan law will be applied to each of Polar Holding's claims. If an issue has not been resolved by the Michigan courts, this Court must "attempt to predict what the Michigan Supreme Court would do if confronted with the same question." *Mazur v. Young*, 507 F.3d 1013, 1016 (6th Cir. 2007) (brackets and internal quotation marks omitted).

### III

Polar Holding raises claims of breach of fiduciary duty, tortious interference, and civil conspiracy. Each will be addressed in turn.

### A

Polar Holding contends that Socia breached his fiduciary duty to Polar Holding's shareholders in three ways: by requesting Affiliated foreclose on PMC's loan; suggesting that Becker request additional intellectual properties be transferred into the escrow account before foreclosure; and by forming a business to purchase the loan secured by the patents and intellectual property. Polar Holding's Resp. 14–15.

Under Michigan law, "a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another." *Teadt v. Lutheran Church Mo. Synod*, 603 N.W.2d 816, 823 (Mich. Ct. App. 1999). When such a relationship exists, the fiduciary — the one who is entrusted to advise the other — "has a duty to act for the benefit of the principal regarding matters within the scope of the relationship." *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, 698 N.W.2d 900, 906 (Mich. Ct. App. 2005) (per curiam). A fiduciary must "'subordinat[e] one's personal interests to that of the other person.'" *Wallad v. Access BIDCO, Inc.*, 600 N.W.2d 664, 666 (Mich. Ct. App. 1999) (per

curiam) (emphasis omitted) (quoting Black's Law Dictionary (6th ed.)). "Whether a duty exists is a question of law for the court to decide." *Prentis*, 698 N.W.2d at 906.

The Sixth Circuit made that decision in this case, concluding that Socia had a "fiduciary duty to Polar Holding [that] continued until he [resigned] on April 18, 2007."[2] *Petroleum Enhancer*, 690 F.3d at 769. The task now before this Court is to determine whether Polar Holding has an actionable claim that Socia breached his fiduciary duty before he resigned.

**1**

Polar Holding first claims that Socia breached his fiduciary duty when he requested that Affiliated foreclose on PMC's loan. Viewing the facts in the light most favorable to Polar Holding, there is a genuine issue of material fact as to whether Socia did so.

As Socia had a fiduciary duty to Polar Holding's shareholders at the time he requested Becker foreclose on PMC's loan, he had "a duty to act for the benefit of the principal regarding matters within the scope of the relationship." *Prentis Family Found. V. Barbara Ann Karmanos Cancer Inst.*, 698 N.W.2d 900, 906 (Mich. Ct. App. 2005) (per curiam) (citing *Teadt*, 603 N.W.2d at 823)). But when Socia suggested that Affiliated, through Becker, foreclose on PMC's defaulted loan, Polar Holding alleges that he was not acting for the benefit of PMC, its parent Polar Holding, or any interested shareholders (including himself). On the contrary, according to Polar Holding, he was affirmatively requesting that Affiliated harm PMC, and therefore Polar Holding and its shareholders, by foreclosing on the loan and precluding any opportunity to remedy the default.

---

[2] Although the Sixth Circuit made clear Socia owed a duty to Polar Holding's shareholders, it did not emphasize that he was a significant shareholder as well. According to Socia's deposition testimony, he was "a stockholder in Polar Holding directly owning 2,020,180 shares, plus 300,000 options to purchase shares." Socia Dep. 6. It follows that any conduct which negatively affected Polar Holding would also negatively affect Socia.

Socia asserted otherwise.  He testified at his deposition that he intended to benefit PMC, Polar Holding, and the shareholders:

> Q:  And then as a result of that — so really, the foreclosure was part of — that was your idea?
> A:  Yes.  So Mark would come around and listen to us but he would not listen.
> Q:  Did you understand that the foreclosure would damage Polar Holding?
> A:  Not anymore [sic] than it was damaged.  I mean, the company was a defunct company and it was in terrible, terrible —  we thought it would probably end up helping the company.
> Q:  What you did, however, you knew would have an effect on Polar Holding and it could be negative, true?
> A:  We thought it would be positive.

Socia Dep. 14.  In other words, Socia believed that, in the best exercise of his business judgment, control of PMC or its assets needed to be arrested from Nelson.

In Michigan, the business judgment rule "presumes corporate directors will act in good faith and in the best interest of the corporation."  *Strickland v. Douglas*, No. 298756, 2011 WL 6268189, at *1 (Mich. Ct. App. Dec. 15, 2011).  "In the absence of bad faith or fraud, a court should not substitute its judgment for that of corporate directors."  *Matter of Estate of Butterfield*, 341 N.W.2d 453, 458 (Mich. 1983).  "A court should be most reluctant to interfere with the business judgment and discretion of directors in the conduct of corporate affairs."  *Id.* at 459.

Polar Holding has, however, established sufficient facts to overcome the protections offered by the business judgment rule and therefore demonstrate a jury-submissible question.  That is, Polar Holding alleges that Socia acted in bad faith — that he acted with the intention of causing harm to Polar Holding (notwithstanding his personal ownership in the company) despite his fiduciary obligation.  Accordingly, the business judgment rule will not protect Socia's conduct here if Polar Holding is able to prove the facts it alleges.

- 12 -

Although there is a genuine issue of material fact as to whether Socia breached his fiduciary duty when he suggested Becker foreclose on PMC's loan, Polar Holding has not satisfied its additional burden of establishing a legitimate question of fact for a jury on the element of proximate cause.

As explained in *Hillside Prods., Inc. v. O'Reilly, Rancilio, Nitz, Andrews, Turnbull & Scott, P.C.*, No. 258908, 2006 WL 1360502 (Mich. Ct. App. May 18, 2006) (unpublished), breach of fiduciary duty is a tort claim where a plaintiff is "required to establish the element of proximate cause." *Id.* at *1 (citing *Veltman v. Detroit Edison Co.*, 638 N.W.2d 707, 713 (Mich. Ct. App. 2004); *Alar v. Mercy Mem. Hosp.*, 529 N.W.2d 318, 323 (Mich. Ct. App. 1995)). "Proximate cause consists of two separate elements: (1) cause in fact, and (2) legal cause." *O'Reilly*, No. 258908, 2006 WL 1360502, at *1 (citing *Alar*, 529 N.W.2d at 323). To establish cause in fact, "a plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Weymers v. Khera*, 563 N.W.2d 647, 652 (Mich. 1997) (quoting *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994)).

Polar Holding alleges that before Socia approached Becker, "Becker had no intention of foreclosing on the loan" from Affiliated to PMC. Polar Holding's Resp. 11–12. Polar Holding argues that without Socia's interference, Affiliated "would have been forced to maintain the status quo." *Id.* at 17. In other words, Polar Holding asserts that had Socia not approached Becker, Affiliated would have let the loan remain in default into perpetuity. Of course, Polar Holding offers no evidence to substantiate this claim aside from Becker's statement that he "had no knowledge of the petroleum-additive industry or what to do with the patents." *Id.* (brackets and citation omitted).

- 13 -

Polar Holding's argument — that Affiliated would never have foreclosed on the defaulted loan without Socia's involvement — is directly contradicted by Becker's September 2010 affidavit.  Becker established,

> Affiliated Investments, LLC . . . granted eight extensions of the loan by Affiliated to Polar Molecular Corporation . . . .  Each extension was granted to PMC based on the assurance of its President, Mark Nelson . . . .  When Mr. Nelson's promises were not kept for the eighth time, I decided in the latter part of 2004 that no further extensions would be granted.  As acknowledged by PMC in its 10k filings for 2004, no further extensions were granted by Affiliated to PMC.
>
> * * * * *
>
> Because of Mr. Nelson's continuous pattern of breaking promises to me and presenting business plans that made no sense, it became clear to me that [Polar Holding] and PMC were destined for failure under the direction of Mr. Nelson.  I was aware that in January 2007, a board of directors meeting was to take place to vote on the removal of Mark Nelson as the controlling officer of PMC and/or [Polar Holding].  At that point, I held off on foreclosing on the Affiliated loan, with hopes that new leadership with a legitimate business plan would increase the opportunity to collect on the Affiliated loan.  When I learned that Mr. Nelson was not voted out of office in January 2007, it became clear to me that foreclosure would be the only viable option.

Becker Aff. ¶¶ 2–5, 8–10.    Becker maintains that Socia approached him with the suggestion to foreclose on the loan only after he had already made the decision to do so.  *Id*. at ¶ 11.  This evidence has not been refuted by Polar Holding.

Accordingly, Polar Holding has not demonstrated "substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred."  *Weymers*, 563 N.W.2d at 652 (quoting *Skinner*, 516 N.W.2d at 479).  Summary judgment is therefore appropriate on Polar Holding's first asserted breach of fiduciary duty.

**2**

Polar Holding next argues that Socia breached his fiduciary duty when he suggested that Becker request additional intellectual properties be transferred by PMC into the escrow account before foreclosure proceedings were commenced.

Again, even assuming that this conduct was a breach of Socia's fiduciary duty, Polar Holding has not established the necessary proximate cause for an actionable tort claim. PMC was contractually obligated to transfer any and all intellectual property into the escrow account — whether Socia suggested Becker make such a request is immaterial.

Through the October 25, 2001 security agreement between Affiliated and PMC, PMC assigned and pledged to Affiliated its rights, title, and interest in, whether then owned or thereafter acquired, "all patents . . . and all other intangible property of every kind and nature." Ind. Defs.' Reply, Ex. L-2, at 1–2. The agreement also required PMC to assign to Affiliated its rights, title, and interest in "[a]ll other assets or other property similar to any of the foregoing hereafter acquired by [PMC]." *Id*. at 3. Pursuant to the sixth amendment to the loan extension, dated August 23, 2004, PMC agreed to place its assignment of intellectual property in escrow to be held by Lester Woodward. Ind. Defs.' Reply, Ex. L-9, at 2.

PMC's obligation to place all of its intellectual property into the escrow account existed independently of any conduct on the part of Socia. Affiliated had the right to all of PMC's intellectual property, including the patent applications that Socia suggested be placed in the escrow account before foreclosure commenced. Polar Holding has not demonstrated "substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Weymers*, 563 N.W.2d at 652 (quoting *Skinner*, 516 N.W.2d at 479). Mark Nelson's November 20, 2012 affidavit — wherein

- 15 -

he claims he would not have agreed to add the patent applications to the escrow account had he known Affiliated intended to foreclose on the loan — is contradicted by the express terms of the security agreement.  Accordingly, it is insufficient to defeat summary judgment.  *See Syvongxay v. Henderson*, 147 F. Supp. 2d 854, 859 (N.D. Ohio 2001) ("self-serving affidavits without factual support in the record will not defeat a motion for summary judgment.") (brackets and citation omitted); *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001) (same).  Summary judgment is appropriate on this asserted breach of fiduciary duty as well.

**3**

Polar Holding's third allegation to support a breach of fiduciary duty involves Socia's formation of Petroleum Enhancer to compete with Polar Holding and PMC.  Like Polar Holding's two previous claims, this claim also fails as a matter of law.

Polar Holding asserts that Socia's creation of Petroleum was a breach of his fiduciary duty because he intended to compete with the former company.  But such conduct, absent contractual restrictions and use of confidential information, is not a breach of a director's fiduciary duty.

In *Quality Mfg., Inc. v. Mann*, No. 286491, 2009 WL 4827068 (Mich. Ct. App. Dec. 15, 2009), the Michigan Court of Appeals addressed the specific issue faced here — whether a director can make arrangements to compete with a principal while owing a fiduciary duty to that principal.  The court explained as follows:

> Several legal treatises have extensive commentary on the issue, including 3 Fletcher Cyclopedia of the Law of Corporations, § 856, which discusses the well-established principle that former officers or directors of a corporation, unless prohibited by contract, may compete against a former employer in the same business and that they "do not violate their duty of loyalty when they merely organize a corporation during their employment to carry on a rival business after the expiration of employment." Likewise, Law of Corporate Officers and Directors: Indemnification and Insurance, § 3:11, provides:

> Unless restricted by contract, corporate officers and directors may resign and form a competing enterprise. This may be done with complete immunity because freedom of employment and encouragement of competition generally dictate that such persons can leave their corporation at any time and go into a competing business. Before actually terminating his or her relationship with the corporation, a corporate officer or director is generally free to make arrangements or preparations for the competing business, provided no wrongful or unfair acts are committed.

This principle is also set forth in Restatement 2d Agency, § 393, comment e, p 218:

> *e. Preparation for competition after termination of agency.* After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. *See* § 396. Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete.

And, again, in Am Jur 2d, Corporations § 1482, p 473–474:

> The fact that one was once a director or officer of a corporation does not preclude such person from engaging in a business similar to that conducted by the company. Generally, in the absence of a contractual provision to the contrary, corporation fiduciaries, such as directors or officers, are free to resign and form an enterprise that competes with the corporation after they sever their connection with it. Further, in the absence of a contract provision to the contrary, former corporate fiduciaries may solicit the customers of their former corporation for business unless the customer list is itself confidential.

And in 2 Callmann on Unfair Competition, Trademarks and Monopolies, § 16:26 (4th edition):

> A partner, employee, agent or independent contractor, who today are business associates, may tomorrow become competitors. Without a restrictive agreement, at the termination of his or her employment an employee can go to work for a competitor or form a competing business. Indeed, even prior to terminating the current employment relationship, the employee has a right to seek and prepare for alternative employment, and has no obligation to disclose to the current employer any intent to become a competitor.

*Id.* at \*4–\*5.  The court then concluded that the defendant "did not breach any fiduciary duty owed to [the plaintiff]" when he planned and secured funding for the creation of a competing business while still employed and owing a fiduciary duty.  *Id.* at \*5.

Likewise, Socia did not breach a legal duty by forming Petroleum with the intent to compete with Polar Holding and PMC after his resignation, even when he remained a director of Polar Holding (that is, despite the efforts of Mr. Nelson to remove him).  Polar Holding has not advanced any contractual provisions restricting Socia from preparing to compete while he remained a board member.  Noted above, and contrary to Polar Holding's argument on the point,[3] Socia had no obligation to disclose his intent to become a competitor.  Finally, the knowledge that PMC's loan was in default and could be foreclosed upon was public knowledge.[4]  Therefore, Socia did not breach his fiduciary obligation when he created Petroleum with the express purpose of competing against Polar Holding and PMC, but did not begin competing until after his resignation in April 2007.

And as before, even if it were true that Socia had breached his fiduciary duty by forming Petroleum Enhancer while still a director of Polar Holding, Polar Holding cannot establish the

---

[3] Polar Holding's reliance on *Prod. Finishing Corp. v. Shields*, 405 N.W.2d 171 (Mich. Ct. App. 1987) for the proposition that "Socia had a duty to fully disclose his activities to [Polar Holding]" is misplaced.  In that case, the court held a fiduciary has a duty to disclose to his principal "a third party's purported refusal to deal with a corporation" before acting to secure the advantage to himself.  *Id.* at 175.  The court was not addressing the duty to disclose information concerning a director's anticipated competition with a principal.

[4] Polar Holding's 2004 Form 10-KSB (annual report filed with the Securities and Exchange Commission) provides:

> ***Substantially all of our assets, including our intellectual property, are subject to liens by our creditors, and these creditors could foreclose on substantially all of our assets if we default on our obligations.  We are currently in default on a number of our notes payable.*** . . . There can be no assurance that we will receive an additional extension from Affiliated or be in a position to repay this debt and free our assets from the related lien in the near future.

Ind. Defs.' Mot. Ex. C, at 8 (emphasis in original).

requisite proximate cause to maintain its breach of fiduciary duty claim.  The alleged harm complained of is Affiliated's foreclosure on PMC's defaulted loan and the subsequent acquisition of PMC and Polar Holding's intellectual property by Petroleum Enhancer.  As established at length, Becker intended to foreclose regardless of Socia's conduct.  Further, when the foreclosure sale commenced, no entity aside from Petroleum Enhancer — including Polar Holding and PMC — bid on the collateral.  So even if Socia breached his fiduciary duty by forming Petroleum Enhancer, this was not a proximate cause of any harm to Polar Holding.

None of the contentions Polar Holding advances to establish that Socia breached his fiduciary duty support an actionable claim.  The Individual Defendants' motion for summary judgment will be granted on this issue.

**B**

Polar Holding also contends that Socia tortiously interfered with its relationship with PMC when he asked Becker to foreclose on the loan.  More directly, Polar Holding alleges that Socia interfered with PMC's ability to continue making payments on debts owed by Polar Holding.

Tortious interference with a business relationship consists of "the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff."  *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003) (internal quotation marks omitted).

Polar Holding argues in support of its tortious interference claim that "Becker had no intentions of foreclosing upon the loan prior to being approached by Socia."  Polar Holding's Resp. 24.  Noted above, this is simply not true.  It has been directly refuted by Becker, and Polar

Holding offers no response.  Polar Holding goes on, "In foreclosing upon the loan, [Polar Holding] suffered damage including, as an illustrative example, monetary payments which were being made by [PMC] on debts owed by [Polar Holding]."  *Id*.  In an unusual twist, Polar Holding then furnishes a footnote that offers a completely alternate viewpoint:

> Specifically, [Polar Holding] had been providing its subsidiary with funds obtained through the sale of stock which was being utilized by the subsidiary to pay off debts and for the purpose of maintaining its operation.  This was an investment on the part of [Polar Holding] and not a loan to the subsidiary.  However, upon the foreclosure and the loss of the intellectual properties, [Polar Holding] was unable to sell additional stock and provide funds to the subsidiary to pay off debts and continue its operation.

*Id*. at 24, n.20 (citations omitted).  This inconsistency was mirrored in the two Mark Nelson affidavits Polar Holding provided to the Court.  In the first, Mr. Nelson established as follows:

> [Polar Holding] also suffered damage in form of the loss of monetary payments which were being made by [PMC] on debts owed by [Polar Holding] . . . Ownership of the patents and intellectual property (which are now owned by Petroleum Enhancer, LLC) was needed in order for [PMC] to make and sell product and make payments on the above-mentioned debt.

Mark Nelson Aug. 20, 2010 Aff. ¶ 10, ECF No. 124, Ex. 1.  Mr. Nelson's November 20, 2012 affidavit tells a different story:

> With regards to the debt payments previously discussed, [Polar Holding] had been providing its subsidiary with funds obtained through the sale of stock of [Polar Holding] which was being utilized by the subsidiary to pay off debts owed by the subsidiary and for the purpose of maintaining its operation . . . .  With regards to debts owed by [Polar Holding] which were paid by the subsidiary, the subsidiary was also directed to utilize funds obtained through the sale of stock of [Polar Holding] to pay those debts as well.  Those expenditures . . . did not constitute an investment but instead were provided as an administrative convenience by the subsidiary.

Mark Nelson Nov. 20, 2012 Aff. ¶¶ 13, 15, ECF No. 153, Ex. Q.

Regardless of the precise relationship between the two parties, one requirement for a tortious interference claim bears emphasis at this point.  Polar Holding must demonstrate that

Socia intentionally interfered with the business relationship between PMC and Polar Holding "inducing or causing a breach or termination of the relationship or expectancy." *BPS Clinical Laboratories v. Blue Cross and Blue Shield of Michigan*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996); *see also Mino*, 661 N.W.2d at 597. That is, a party who is alleged to have interfered with an advantageous business relationship must have intended the interference. *See Arim v. General Motors Corp.*, 520 N.W.2d 695, 703 (Mich. Ct. App. 1994) (per curiam) ("there was no genuine issue of material fact regarding plaintiffs' claim . . . because there was no indication that defendants had any motive to interfere with the business relations of plaintiffs."); s*ee also Pedell v. Heartland Health Care Ctr.*, No. 271276, 2007 WL 840876, at *9 (Mich. Ct. App. Mar. 20, 2007) (plaintiff's tortious interference claim was dismissed because "plaintiff lacks evidence that defendants' *intentionally* interfered with plaintiff's business expectancies, as required.") (emphasis in original) (citation omitted).

Here, Polar Holding has offered nothing to demonstrate that when Socia suggested Becker foreclose on PMC's loan, he intended to interfere with the relationship between PMC and Polar Holding. Polar Holding offers nothing but this conclusory statement, "[Socia's] actions were improper and thus actionable based upon a tortious interference cause of action." Polar Holding's Resp. 25. In fact, Polar Holding has always maintained that Socia asked Becker and Affiliated to foreclose on the loan so that he could acquire the intellectual property through Petroleum Enhancer; not so he could interfere with PMC and Polar Holding's relationship.

There has been no evidence presented to demonstrate that Socia requested Becker foreclose on the loan for any reason other than to acquire the collateral through Petroleum Enhancer. Because Polar Holding has not presented evidence that Socia "had any motive to

interfere with [PMC and Polar Holding's] business relations," summary judgment is appropriate on this claim as well.

C

Polar Holding's final claim is that the Individual Defendants — Becker, Hill, and Socia — committed the tort of civil conspiracy. Polar Holding alleges that the three men conspired to breach Socia's fiduciary duty to Polar Holding. However, because Polar Holding has not alleged an independent, actionable claim, its civil conspiracy claim cannot stand.

Civil conspiracy consists of "(1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means." *Mays v. Three Rivers Rubber Corp.*, 352 N.W.2d 339, 341 (Mich. Ct. App. 1984). As implied, "a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable, tort." *Early Detection Ctr., P.C. v. N.Y. Life Ins. Co.*, 403 N.W.2d 830, 836 (Mich. Ct. App. 1986). As established by the Sixth Circuit, "[h]ere, there are only two possible independent torts upon which the conspiracy claim could be predicated: breach of fiduciary duty and tortious interference." *Petroleum Enhancer*, 690 F.3d at 769. The Sixth Circuit concluded that "Polar Holding has standing to bring the civil-conspiracy claim, just as it has standing to bring the breach-of-fiduciary-duty claim." *Id.* at 771.

Polar Holding acknowledges that to succeed on its civil conspiracy claim it must demonstrate that Socia "breached his fiduciary duty." Polar Holding's Resp. 20. Because Polar Holding's breach-of-fiduciary-duty claims were properly dismissed, its civil conspiracy claim will also be dismissed. *See Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. App. Ct. 2003) (where plaintiffs "failed to establish any actionable underlying tort, the conspiracy claim must also fail."); *Pedell*, 2007 WL 840876, at *9 ("a claim

- 22 -

for civil conspiracy requires proof of a separate, underlying actionable tort. Here, because plaintiff's tort claims were properly dismissed, plaintiff's civil conspiracy claim was also correctly dismissed.") (citations omitted).

Polar Holding's breach of fiduciary duty and tortious interference claims against Socia have been properly dismissed. It follows that Polar Holding's civil conspiracy claim will also be dismissed.

**D**

There is one additional motion pending on the docket: Polar Holding's motion to strike. According to Polar Holding, in the Individual Defendants' reply brief addressing the motion for summary judgment, "the moving parties are now suggesting and seek to raise a new issue in a footnote." Polar Holding's Mot. 3, ECF No. 157. The specific allegation is that the Individual Defendants were attempting to argue that the intellectual properties had no value because the patents had expired. *See* Ind. Defs.' Reply 4–5, n.2. Because the proposition was not considered in the Court's analysis of the Individual Defendants' motion for summary judgment, Polar Holding's motion to strike will be denied as moot.

**IV**

Accordingly, it is **ORDERED** that the Individual Defendants' motion for summary judgment, ECF No. 149, is **GRANTED**.

It is further **ORDERED** that Polar Holding's motion to strike, ECF No. 157, is **DENIED** as moot.

It is further **ORDERED** that Polar Holding's claims are **DISMISSED** with prejudice.

This resolves the last pending issue and closes the case.


Dated: February 22, 2013                    s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 22, 2013.

                    s/Tracy A. Jacobs
                    TRACY A. JACOBS